IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| THOMAS R. SHEHEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:08-CV-436 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons that follow, defendant's motion for summary judgment [doc. 13] will be granted, and plaintiff's motion for judgment on the pleadings [doc. 11] will be denied.

I.

*Procedural History*

Plaintiff was born in 1965. He filed the present benefits applications in August 2005, claiming to be disabled by "lumbar radiculopathy, [high blood pressure], instability regarding walking - fall frequently [sic], chronic pain, [and] failed back surgeries." [Tr. 392,

398, 651].[1] The present applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("the ALJ") on August 16, 2007.

By decision dated September 27, 2007, the ALJ ruled plaintiff ineligible for benefits. Plaintiff then again sought Appeals Council review. In February 2008, the Appeals Council granted plaintiff's request for remand. [Tr. 52-54].

Plaintiff received a second administrative hearing in May 2008. Later that month, the ALJ issued a second decision denying benefits. He concluded that plaintiff suffers from "disorders of the back (discogenic and degenerative)," which is a "severe" impairment but not equal to any impairment listed by the Commissioner. [Tr. 33-34]. Citing "many inconsistencies," the ALJ termed plaintiff's subjective complaints "not credible." [Tr. 35]. The ALJ found plaintiff to have the residual functional capacity ("RFC") to perform light exertion subject to certain postural limitations. [Tr. 34]. Relying on vocational expert testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the regional and national economies. [Tr. 36]. Plaintiff was accordingly again deemed ineligible for benefits.

---

[1] Plaintiff previously applied for benefits in January 2001, alleging a disability onset date of June 7, 2000. [Tr. 145, 153]. Those applications were denied by Administrative Law Judge decision dated February 19, 2003, and by action of the Commissioner's Appeals Council dated April 11, 2003, which was not further appealed. [Tr. 20]. Plaintiff again applied for benefits in December 2004, with an alleged disability onset date of February 20, 2003. [Tr. 20]. Those applications were denied initially on April 20, 2005, and were not further pursued. [Tr. 20].

Plaintiff then again sought, but was denied, Appeals Council review. [Tr. 10]. The ALJ's ruling became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through his timely complaint, plaintiff has properly brought his case before this court. *See* 42 U.S.C. § 405(g).

II.

*Applicable Legal Standards*

Review of the Commissioner's decision is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1).

3

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[2] Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[2] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

III.

*Background*

Plaintiff reports a high school education plus two years of college, and his past relevant work includes factory, photography, and restaurant jobs. [Tr. 408-09, 413]. He allegedly stopped working in June 2000 after a motorcycle accident. That accident, and a subsequent fall at a circus, led to two back surgeries.

Plaintiff purports to be in constant pain which prevents him from working. He allegedly "can't get up and move around. I am not able to bend or move around very much. I can't lift. It's hard to even get up out of the chair." [Tr. 408]. Plaintiff claims to "mostly just sit[] in a chair" watching television and listening to gospel music. [Tr. 632-33]. Nonetheless, the administrative record indicates that he is able to drive his children to and from school and sports practices, drive his wife to and from work, drive his wife to the store, attend his children's sporting events, vacuum and perform other housework on occasion, care for his grandchildren, attend flea markets approximately every other week, "walk[] around the yard telling his children what to do," and "yell at people going up and down the road."

5

[Tr. 427, 552-53, 609, 620-21, 633, 689].

IV.

*Analysis*

Plaintiff specifies only two challenges to the ALJ's final decision: (1) that it was error not to find that he has a severe impairment of the right shoulder; and (2) that it was error to reject the opinion of treating physician Julie Jacques. Any issue not specifically raised by plaintiff has been waived. *See, e.g., Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490-91 (6th Cir. 2006).

> [W]e decline to formulate arguments on Hollon's behalf, or to undertake an open-ended review of the entirety of the administrative record to determine (i) whether it might contain evidence that arguably is inconsistent with the Commissioner's decision, and (ii) if so, whether the Commissioner sufficiently accounted for this evidence. Rather, we limit our consideration to the particular points that Hollon appears to raise in her brief on appeal.

*Id.* at 491.

A. Shoulder Impairment

At step two of his sequential analysis, the ALJ found only one "severe" impairment - disorders of the back. As plaintiff correctly observes, the "severe" impairment threshold is a "*de minimis* hurdle" which is to be used only "as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 862-63 (6th Cir. 1988) (citation omitted). However, even if the court were to assume *arguendo* that plaintiff's shoulder condition is "severe," reliance on *Higgs* is misplaced.

6

This is not a case in which a claimant has alleged only one impairment. In such cases, an adverse determination at step two causes the entire application to be "screened out" as "totally groundless." By contrast, in the present case plaintiff alleges - and the ALJ recognized - another severe impairment. Accordingly, despite the finding that only one of the alleged impairments was "severe," plaintiff's claim survived step two. *See, e.g., Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ then went on to consider plaintiff's additional allegations in reaching his RFC conclusion.

Plaintiff first visited Dr. James Jordan in July 2006 complaining of right shoulder pain. Examination indicated some tenderness but full range of motion, and x-rays revealed "no significant degenerative findings." [Tr. 605]. Plaintiff returned in November 2006. Dr. Jordan again observed some tenderness. He diagnosed some "joint arthralgia and degenerative disease." [Tr. 642]. The notes of a June 2007 appointment reflect the same complaint and diagnoses. [Tr. 640]. During each visit, Dr. Jordan performed an injection and he described that treatment as "quite beneficial." [Tr. 605, 640-42].

Consulting examiner Dr. Bertram Henry's January extremities examination showed full strength in the upper extremities. [Tr. 610]. Dr. Henry opined that plaintiff is "unlimited" in manipulative actions such as handling and reaching. [Tr. 615].

Dr. Jordan eventually performed surgical decompression and inspection of the rotator cuff in April 2008. The surgery revealed "[s]ignificant degenerative changes . . . in the AC joint" but no rotator cuff tear. [Tr. 649-50]. Dr. Jordan's subsequent notes indicate

7

that plaintiff was healing well. Consistent with Dr. Henry's evaluation, no permanent restrictions can be found in Dr. Jordan's file. [Tr. 645-46]. At his most recent administrative hearing, which was approximately six weeks after the surgery, plaintiff testified that he was recovering "I guess about normal, I suppose." [Tr. 685].

The ALJ did not impose any RFC limitations pertaining to the right shoulder because the surgery was very recent and plaintiff had not had time to heal. [Tr. 693]. The ALJ correctly noted that "disability" requires the existence of an impairment or impairments that have "lasted or can be expected to last for a continuous period of not less than 12 months." [Tr. 21]. Specifically pertaining to plaintiff's shoulder, the ALJ cited Dr. Jordan's observations of improved health and concluded "that the claimant's shoulder *surgery* constitutes a severe impairment; however, it is not expected to last for any continuous period of 12 months as required by Social Security Regulations." [Tr. 33] (emphasis added). That conclusion is consistent with the substantial evidence of record as cited herein and will not be reversed.

B. Treating Physician

Plaintiff first visited osteopathic physician Julie Jacques in April 2004 due to seizure complaints. In February 2005, plaintiff asked Dr. Jacques to evaluate his lower back pain for Social Security disability reasons. [Tr. 510].

An electrodiagnostic study that month revealed no evidence of lumbar radiculopathy. Dr. Jacques wrote, "However, the patient's signs and symptoms are typical

8

of a lumbosacral radiculopathy and the patient has had low back surgery with fixation, so we will investigate further by examining his most recent lumbosacral MRI." [Tr. 522]. A March 2005 MRI showed the prior surgeries along with "moderate" desiccation and bulging at L3-4 which "appear[ed] to be causing an element of L3-4 neuroforaminal narrowing with crowding if not slight irritation or impingement upon the exiting nerve roots." [Tr. 521]. Following plaintiff's April 6, 2005 appointment, Dr. Jacques wrote,

> [H]e had an EMG and nerve conduction that was normal. However, the patient's signs and symptoms were typical so we went ahead with an MRI. The patient does have pedicle screws at L4-L5 and disc desiccation at L3-L4 with neural foraminal narrowing. This suggests an explanation for his normal EMG and his chronic low back pain.

[Tr. 509]. Dr. Jacques then completed a Medical Opinion Form in June 2005, opining that plaintiff is incapable of completing a forty-hour work week at any level of exertion. [Tr. 506-08].

The ALJ noted that Dr. Jacques's opinion differed from several other opinions of record. [Tr. 35]. He wrote, "The assessment prepared by Dr. Jacques is inconsistent with the opinion of the claimant's orthopaedist, and is based upon the claimant's subjective complaints, which leads to questions about the claimant's presentations as well as his credibility." [Tr. 35]. The court agrees that Dr. Jacques's assessment is largely worded as an endorsement of plaintiff's subjective complaints, and the court shares the ALJ's concern over the inconsistencies and exaggerations rampant in plaintiff's self-reporting. Because they impact the degree to which Dr. Jacques's views can be credited, the court will discuss

9

a sampling of those inconsistencies and overstatements before turning to a review of the medical evidence as a whole.

1. Credibility

As noted above, the ALJ found plaintiff "not credible." [Tr. 35]. The ALJ observed "numerous contradictory or misleading statements regarding the injuries he sustained in 2000, his limitations, and his history of substance abuse. . . . There are many inconsistencies in the claimant's reports to consultative examiners which are refuted by the objective medical evidence of record." [Tr. 35]. The ALJ's observations are correct. The administrative record shows a clear pattern of overstatements and untruths which would cause any adjudicator to seriously question the reliability of plaintiff's back pain complaints.

> 1. A few days after his motorcycle accident, plaintiff appeared at Dr. Edward Capparelli's office in "great distress" with a tender right wrist, three bandaged fingers on the left hand, and a wrapped left foot. [Tr. 283]. Dr. Capparelli noted that plaintiff's right wrist had previously been broken "recently" <u>prior to</u> the motorcycle wreck. [Tr. 283]. June 14, 2000 x-rays of left foot, right wrist, and left hand were "<u>normal</u>" with "<u>no evidence of fracture</u> or dislocation." [Tr. 337] (emphasis added). Lumbar and cervical x-rays taken the night of the accident were deemed "<u>normal</u>" by Dr. Karen Brock. [Tr. 240] (emphasis added). Nonetheless,
>
> > (a) In July 2000, plaintiff told Dr. Merrill White that his accident resulted in a fractured left big toe. [Tr. 321].
> >
> > (b) In May 2001, plaintiff told consulting examiner Dr. Karl Konrad that the accident resulted in a fractured right wrist, three "smashed" fingers on the left hand, and an injury to the left big toe. [Tr. 289].
> >
> > (c) In 2007, plaintiff told Dr. Henry that the wreck caused fractures of both wrists, both ankles, and the left big toe. [Tr. 608].

10

(d) In April 2007, plaintiff told consulting examiner Pamela Branton that the accident resulted in a broken back, two broken wrists, two broken ankles, a broken neck, and broken fingers on the left hand. [Tr. 629-30].

2. As noted by the ALJ [Tr. 29], in November 2005, seven days after having appeared at physical examiner Dr. David McConnell's office walking without a limp or assistive device [Tr. 547], plaintiff appeared at mental examiner Alice Garland's office "walk[ing] very slowly with a limp." [Tr. 552].

3. In evaluating treating source opinions, ALJs and courts consider factors including the nature of the treatment relationship and the knowledge that the provider has about the claimant's overall condition. *See* 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii). At his initial appointment with Dr. Jacques, plaintiff "denie[d] smoking, drinking, and recreational drugs." [Tr. 515]. He provided that same information to Dr. Jacques on May 20, 2004, January 17, 2005, February 17, 2005, April 6, 2005, December 15, 2005, and February 3, 2006. [Tr. 509-11, 514, 600, 602]. Similarly, on April 5, 2005, plaintiff told Dr. McConnell that he has "never" used any alcohol or drugs including marijuana. [Tr. 534]. However,

> (a) On June 21, 2000, plaintiff was treated at the emergency room of Baptist Hospital of Cocke County for what the staff deemed an "alleged" Valium overdose secondary in part to having been "charged . . . with disorderly conduct." [Tr. 224, 232-33]. In addition to Valium, plaintiff also tested positive for marijuana that day. [Tr. 223]. He was described as "uncooperative" and "very combative," and he was discharged into the care of the county sheriff's department. [Tr. 219, 233] (emphasis in original).

> (b) On June 28, 2000, plaintiff told Dr. Capparelli that he was consuming "all the marijuana I can" for pain relief. [Tr. 282].

> (c) A January 2004 drug screen was positive for marijuana (yet was inexplicably negative for plaintiff's prescription oxycontin medication). [Tr. 589, 598].

> (d) A February 2004 drug screen was positive for marijuana. [Tr. 593].

11

(e) A September 2004 drug screen was positive for marijuana. [Tr. 482].

(f) A May 2005 drug screen was positive for marijuana. [Tr. 476].

(g) In November 2005, plaintiff told consulting examiner Garland that he smokes marijuana only "occasionally whenever someone comes by with it." [Tr. 552].

(h) In March 2007, plaintiff told consultative examiner Donna Abbott that he had used marijuana only "back during his college years." He denied "any current or past alcohol use." [Tr. 619].

(i) In April 2007, plaintiff told consultative examiner Branton that he was "a heavy, daily alcohol drinker" from approximately 1982 through 1990, and that "he also used marijuana, cocaine, Valium, Xanax, and 'anything' on a daily basis during that same time period." [Tr. 632]. Plaintiff further told Ms. Branton that he continues to smoke marijuana daily "for nausea from his medications." [Tr. 632].

(j) At his 2007 administrative hearing, plaintiff testified that he smokes marijuana daily because, "It just relaxes me." [Tr. 679].

With these myriad inconsistencies in mind, the court will review plaintiff's subjective complaints of constant, disabling back pain in light of the medical record as a whole.

## 2. Opinion Evidence Other Than Dr. Jacques

A July 2000 lumbar MRI showed "[l]arge lateral disc extrusion on the left at L4-5 causing severe neuroforaminal stenosis." [Tr. 336]. Dr. Merrill White performed surgery to remove herniated disc material in August 2000. Post-surgery imaging showed that "vertebral body heights and disc spaces grossly appear maintained." [Tr. 331]. On September 18, 2000, plaintiff told Dr. White that he no longer had any lower back pain and only intermittent radiating pain in the left thigh. [Tr. 313].

12

However, by January 2001 plaintiff reported increasing pain in both the back and thigh secondary to a fall at the circus. [Tr. 310-11]. On January 22, 2001, plaintiff asked Dr. Capparelli for a letter documenting that he is "unable to care for himself." [Tr. 277]. Dr. Capparelli refused to write the letter, commenting that while plaintiff may experience pain he is not incapacitated or unable to perform activities of daily living. [Tr. 277].

A February 2001 lumbar MRI showed disc protrusion at L4-5 along with disc desiccation at L4-5 and L5-S1. [Tr. 272]. Dr. White performed decompression surgery at L4-5 in March 2001. Following a generally unremarkable August 2001 examination, Dr. White "[e]xpressed to him that most people with a single level lumbar spine fusion are capable of working at a light to moderate level and at this point I don't have any evidence that he is in fact disabled from a medical point of view." [Tr. 301-02].

Dr. McConnell performed his first consultative examination in April 2005. Plaintiff ambulated without a limp or assistive device. [Tr. 535]. Dr. McConnell physically examined plaintiff in addition to reviewing lumbar imaging. Dr. McConnell concluded that, due in part to chronic low back pain, plaintiff could work but at no more than a range of medium exertion. [Tr. 536-37].

Dr. McConnell performed his second consultative examination in November 2005. Plaintiff again ambulated without a limp or assistance. [Tr. 547-48]. Following examination and review of a lumbosacral x-ray, Dr. McConnell opined that plaintiff's previous back fusion was in good position with good alignment of the hardware. [Tr. 548].

13

### 3. Dr. Jacques

The Commissioner's regulations provide in pertinent part, "When the treating source has seen you a number of times *and long enough to have obtained a longitudinal picture of your impairment*, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) (emphasis added). As discussed above, on February 17, 2005, plaintiff asked Dr. Jacques to evaluate his low back pain complaints "to determine his level of disability." [Tr. 510]. Dr. Jacques had "not worked him up for this before." [Tr. 510]. Dr. Jacques then: (1) examined plaintiff [Tr. 510]; (2) reviewed an electrodiagnostic study which revealed no evidence of lumbar radiculopathy [Tr. 522]; (3) reviewed a lumbar MRI [Tr. 509]; (4) met with plaintiff at an April 6, 2005 appointment [Tr. 509]; (5) opined that the MRI "suggest[ed] an explanation for" his subjective complaints [Tr. 509]; and (6) completed the Medical Opinion Form more than two months later opining that plaintiff is totally disabled. [Tr. 506-08].

Therefore, the depth of Dr. Jacques's treatment relationship - at least as it pertains to plaintiff's back complaints - is not significantly different from the consulting physical examiners. For example, like Dr. Jacques, Dr. McConnell examined plaintiff, reviewed lumbar imaging, and then offered an opinion regarding vocational capacity. Dr. McConnell's opinion was consistent with that of the treating surgeon Dr. White who, following a physical examination and a review of lumbar imaging similar to that reviewed

14

by Dr. Jacques, concluded that he did not "have any evidence that he is in fact disabled." [Tr. 301-02]. The court notes that other lumbar imaging was interpreted as showing: (1) "[n]o significant abnormalities" in January 2004 [Tr. 469]; (2) no "pathologic findings" in July 2005 [Tr. 464]; and only "mild" findings with low grade spondylolisthesis in September 2005. [Tr. 519].

Therefore, when considered in light of the entire objective record and the factors set forth at 20 C.F.R. §§ 404.1527(d) and 416.927(d), Dr. Jacques's opinion was not entitled to controlling weight. Substantial evidence supports the ALJ's rejection of Dr. Jacques's opinion for the reasons set forth in his final ruling [Tr. 35]. The court additionally notes that Dr. Jacques's assessment is devalued because, unlike the ALJ, she did not have the benefit of plaintiff's entire medical record showing a clear pattern of exaggeration and misrepresentation.

It should be made clear that the ALJ did not conclude that plaintiff does not suffer some discomfort. Plaintiff's pain complaints were taken into account in restricting the RFC to no more than a range of light exertion. It is the *severity* of plaintiff's condition that is at issue, and substantial evidence supports the ALJ's conclusion that plaintiff's complaints are overstated.

There is evidence that plaintiff suffers from conditions that could reasonably be expected to cause some discomfort. *See generally Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986). However, viewing the present administrative record

as a whole, a reasonable fact-finder could conclude that plaintiff's documented conditions are not "of such a severity that [they could] reasonably be expected to produce the alleged disabling pain." *See id.* at 853.

The Commissioner's final decision survives substantial evidence review and will not be reversed by this court. An order consistent with this opinion will be entered.

ENTER:

<u>      s/ Leon Jordan      </u>
United States District Judge